JOSÉ CAPÓ CABALLERO, Plaintiff and Appellant, *v.* ÁNGEL RAMOS, Defendant and Appellee.

No. 12021.  Decided October 6, 1961.

626

*Félix Ochoteco, Jr.* and *Enrique Igaravidez* for appellant. *Brown, Newsom & Córdova* for appellee.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, and Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

This is an action for specific performance of contract and other particulars. On August 1, 1952, plaintiff José Capó Caballero and Mr. José G. González, in representation of defendant Ángel Ramos, signed the following document, drawn up in English, which reads as follows:

### "OPTION

"For and in consideration of the sum of ONE HUNDRED AND 00/100 DOLLARS ($100.00), to me in hand paid the twenty-fourth of June, 1952, I hereby grant unto—Ángel Ramos—an option to purchase from me not less than 5.1 cuerdas to be segregated from my farm of 151.13 cuerdas, situated in ward Hato Nuevo, Guaynabo, Puerto Rico, hill known as 'La Marquesa.'

"Said 5.1 cuerdas shall be purchased in a single lot, including the highest available spot in my said farm, at a price of FIVE HUNDRED AND 00/100 DOLLARS ($500.00) per cuerda, not later than the twenty-fourth of August, 1952, at which time the amount paid on this option shall be credited to the purchase price. Should grantee fail to exercise this option, the amount paid shall be retained by grantor in full settlement of liquidated damages.

"In case the grantee exercises his right to purchase the said lot:

"(a) The lot will be surveyed and the parcel sold located by agreement between grantor and grantee, and said lot shall include the highest point in said 'La Marquesa' hill.

"(b) The grantee will: (1) construct at his expense and maintain a paved road wide enough for two-way vehicular

motor traffic, up to his said lot, traversing such parts of the farm of the grantor as grantor may determine; (2) extend power and light lines up to his lot at his expense, and (3) arrange for its own water reservoir, and water distribution system.

"(c) The use of all facilities built under paragraph (b) above, shall be made available to the grantor, his successors or assignees, without any charge.

"Nothing herein agreed shall limit the right of grantor to dispose of any other portion of his farm for purposes similar to those for which grantee desires the optioned lot.

"The grantee will start his paved road beginning at the termination of the grantor's present private road, and shall keep the said grantor's private road down to the junction with Aguas Buenas Insular Road at Km. 4.7, in well paved and transitable condition, repairing bridges, culverts, shoulders, drainage ditches, etc., to that end at his own expense, without any duty by grantor to contribute to such upkeep.

"The option is granted to grantee for the exclusive purpose of erecting a television tower and necessary facilities for the explotation of a television sending station.

"Further terms and conditions not inconsistent with preceding shall be arranged for by grantor and grantee upon execution of necessary deed.

"This option supersedes and nullifies the option granted on the same piece of land to Mr. Ángel Ramos, dated June 24, 1952.

"August 1, 1952, San Juan Puerto Rico. (Signed): J. Capó Caballero, grantor. (Signed) Ángel Ramos, by: José E. González."

The option of June 24, 1952, referred to above, was drawn up in almost identical terms, except for the fact that it was signed by Capó Caballero only.

On August 22, 1952, J. Oviedo, in his capacity of attorney in fact for Ángel Ramos, sent a letter to the plaintiff which reads as follows:

"For and in the name of Mr. Ángel Ramos I hereby exercise his option to buy certain lands owned by you and situated at Hato Nuevo Ward, Guaynabo, Puerto Rico, under the terms and conditions of the option granted by you to said Mr. Ángel Ramos on August 1, 1952. This will, therefore, constitute a binding

contract between the parties which will be evidenced by a public deed to be executed by you and Mr. Ramos or his agent.

"Mr. José G. González, attorney for Mr. Ángel Ramos, is at present in the United States. Upon his return, which will be before the 30th of this month, he will prepare the deeds for the conveyance and immediately thereafter you will be informed that they are ready for your signature. (Signed) J. Oviedo, Attorney in Fact for Mr. Ángel Ramos."

With this letter there was enclosed a check in favor of the plaintiff covering the balance of the sale, in addition to the sum of $100 which was delivered at the time of signing the original option.

On June 30, 1953, almost one year later, the plaintiff demanded in writing from the defendant the performance of the contract, and in order to facilitate the execution he enclosed a proposed deed prepared by his attorney. In the said proposal there appeared both parties, the plaintiff and his wife as vendors, the option was literally transcribed, the farm and the lot to be sold were described, and the vendors stated therein that it comprised the highest spot owned by them on the described property on the northeast slope of the hill known as "La Marquesa." Reference was also made to the works which the defendant was bound to construct and conserve pursuant to the option. The aforesaid letter was not answered. On October 16, 1953, Lic. González, attorney for the defendant, wrote to plaintiff's attorney that his client took the position that he made use of the option on the basis of false representation and that it was therefore untenable, and that Mr. Capó was bound to refund the amount paid.

All the foregoing facts were admitted in the answer. Others were denied. The defendant raised several special defenses, among others, that he gave his consent through error because his purpose, which he so communicated to the plaintiff, was to acquire a lot of 5.1 cuerdas on the highest point of the hill known as "La Marquesa," regardless of who owned that spot, and that he negotiated with the plaintiff

in the understanding, induced by the latter, that the plaintiff's property included the highest point on the hill "La Marquesa"; that it was not until after the option was signed that the defendant learned that the plaintiff's property did not extend as far as the highest point of the hill "La Marquesa," and that he gave his consent upon deceit on the part of the plaintiff because, through his words, representations, and insidious machinations, he led him to believe, knowing that it was not true, that his property comprised flat lands on the highest point of a farm known as "La Marquesa"; that the parcel to be segregated comprised the highest point of the hill "La Marquesa" without there being any adjacent land of a greater altitude, and would serve the defendant's purpose to construct a television tower. Furthermore, the defendant filed a counterclaim for recovery of the $2,500 paid.

Among the findings of fact made by the trial court we find the following:

(1) That the defendant, who was interested in procuring an adequate spot for constructing a television tower and accessory building, in June 1952 instructed his employee, engineer Ángel del Valle, to inspect the hill "La Marquesa" in the jurisdiction of Guaynabo or Aguas Buenas and to inform him whether its altitude and location were adequate for the construction of a tower and building for a television station. In the same month of June, engineer Del Valle carried out his commitment and without climbing to the top he viewed the hill "La Marquesa" and studied it in connection with its geographical location and altitude which was higher than the surrounding hills. After receiving the information from engineer Del Valle, and in the belief that plaintiff Capó Caballero was the owner of the plateau of the hill "La Marquesa" which was the highest, in June 1952 the defendant commissioned Manuel del Valle, a friend of both parties and the engineer's brother, to get in touch with Capó for the pur-

pose of considering the possibility of acquiring a tract of land in the said plateau of the hill "La Marquesa" for the construction of the tower and building. Manuel del Valle complied and the plaintiff was inclined to sell the land necessary at $500 per cuerda and other considerations. The plaintiff and his wife were the owners of certain property of more than 100 cuerdas in that jurisdiction where the hill "La Marquesa" is located, on top of which there is a plateau.

(2) That in June 1952 engineer Del Valle informed the plaintiff that Ramos was interested in acquiring some five cuerdas of flat or semiflat land on the highest point of the hill "La Marquesa" for a television tower, and the plaintiff drew up an option for 60 days in consideration of the sum of $100, and the defendant accepted the contract on June 24, 1952.

(3) That before signing the contract of option of August 1, 1952 and using it, the defendant had ascertained through the U.S. Geodetic Survey that the hill "La Marquesa" on the top of which there was a plateau was the highest point in the area, and that in the application for a permit to construct the station the defendant informed the Federal Communications Authority that the tower and its accessory building would be constructed on that spot.

(4) That by August 9, 1952, before the defendant used the right of option of August 1, engineer Del Valle and attorney José G. González, in representation of the defendant, visited the plaintiff's property with plaintiff so that Del Valle would visit the place where Capó was going to segregate the 5.1 cuerdas mentioned in the option. The court concluded:

" ... These three persons entered by car the plaintiff's property and proceeded as far as the end of the road, and from there on engineer Del Valle and the plaintiff proceeded by foot, and after climbing for some time toward the top of the hill La Marquesa, they stopped without reaching the top. Capó pointed to Del Valle from that place the highest point of the hill precisely

where the plateau in question is located, stating that that was the place where the 5.1 cuerdas to be acquired by defendant Ángel Ramos were located. Since it was raining, they returned to the place where they had left Lic. González in their automobile. The court is of the opinion that both engineer Del Valle and attorney González inferred and believed, from the interview and exchange of views with the plaintiff, that the 5.1 cuerdas which the defendant proposed to acquire were located on the mesa or plateau of the hill La Marquesa and that plaintiff Capó was the owner of those lands. The plaintiff said or did nothing at that interview which might have been inconsistent with that impression."

(5) That in April 1953, at a luncheon, the parties and their attorneys were apparently satisfied with the agreement reached. In May 1953, engineer Rafael Delgado Márquez joined the service of the defendant as manager of the television station. Delgado Márquez got in touch with the plaintiff, asked him for a blueprint of his property, and was given an old one. He visited the hill "La Marquesa" carrying with him the drawing and the application for construction made to the Federal Communications Authority for the purpose of inspecting and locating the place. He climbed, not by the plaintiff's land, but by adjoining lands belonging to Lic. Jorge Ortiz Toro, and upon reaching the place in question he realized that the plateau was outside of the plaintiff's lands and inside of Ortiz Toro's lands. Delgado Márquez realized that the plaintiff's lands nearest to the top of "La Marquesa" were bounded on the north by the plateau, and, instead of being flat or semiflat at that place, they sloped at an angle of approximately 45 degrees, and concluded that the construction of the tower and building on the lands adjacent to the top of the hill and which belonged to the plaintiff would be economically prohibitive.

(6) That engineer Delgado Márquez informed the plaintiff of the error as to the location of the 5.1 flat cuerdas on the hill "La Marquesa," and that the plaintiff insisted that he had not offered the 5.1 cuerdas on the top or highest point

of the hill "La Marquesa," but on the highest point of his property which was part of the hill "La Marquesa."

(7) That the defendant leased from Lic. Ortiz Toro, for 99 years, the said 5.1 semiflat cuerdas on the top of the hill "La Marquesa" and constructed there the tower and accessory building for the station. Although the tower was not constructed on the highest point of the 5.1 cuerdas leased from Ortiz Toro, it was constructed on a point which was, for all practical purposes, of the same altitude selected by Delgado Márquez as the best one under the circumstances.

(8) The court also concluded that, as a question of fact, the plaintiff was not the owner of the semiflat lands on top of the hill "La Marquesa" but of the adjoining lands which, because of their topography, were not fit for the construction of a television tower and building; that the defendant used the option of August 1, 1952, and accepted its terms in the *erroneous belief* that the object of the contract, the lands, were located on the highest point of the hill "La Marquesa," and that they were the suitable ones because they were semiflat for the construction of the tower.

(9) Lastly, the court concluded that the plaintiff at no time before Delgado Márquez discovered the error informed the defendant or his agents, employees, or attorneys, or acted in any manner which might be incompatible with the defendant's erroneous belief that the plaintiff was the owner of, and could bind himself to sell, 5.1 cuerdas on the highest point of the hill "La Marquesa," and that as a question of real and positive fact there is involved in this litigation an error on the substance of the thing object of the contract, derived from acts unknown to the party who bound himself to contract of his own will. The trial court made an inspection.

In view of the foregoing findings of fact, the court concluded as a matter of law that the contract which apparently became legal when the defendant used the option to acquire the 5.1 cuerdas of land from the plaintiff, pursuant to the

stipulations of the option of August 1, 1952, is void and does not bind the defendant, since the latter gave his consent through error in the identity as well as in the essential attributes or characteristics of the thing object of the contract. The contract having been declared void, it concluded that the parties were bound to restore reciprocally the promises made in favor of each other; it dismissed the complaint, granted the counterclaim, and ordered the plaintiff to pay to the defendant the sum of $2,500 which he had paid as selling price.[1]

The appellant maintains before this Court that the trial court erred in applying to the facts of this case § § 1218 and 1221 of the Civil Code, and also challenged some of the findings of fact made by the trial court alleging that they are not supported by the evidence. We need not consider the point relative to § 1221, since the trial court did not base its finding on the existence of deceit and, in the light of the evidence and the applicable doctrine, it seems that there was no basis for such finding.

---

[1] The trial court expressly stated that the evidence relating to the construction of a road on the property of plaintiff Capó Caballero had been postponed to be heard at another hearing, if necessary. It also stated that it was unnecessary to consider and pass upon other grounds of nullity alleged by the defendant in his answer. One of these grounds of nullity, to the effect that the plaintiff could not validly grant the option because it involved community property, is not supported by the record, since, apart from the nature of the right involved before accepting the option, it was established by the testimony given in court by the spouses that the wife had knowledge of the transactions being carried out, that they were discussed in her presence, that she never objected, and also that she also appeared as vendor in the proposed deed which the plaintiff submitted to the defendant. Another ground of nullity which is not supported by the record either is that the option was made on an indeterminate and uncertain thing. Although the parcel of 5.1 cuerdas already surveyed was not described in the text of the option, the specific location was to be determined by the parties at the agreed spot. The other ground of nullity is that the performance of that part relative to the location and extension of the road to be constructed as far as the tract to be acquired, was left to the discretion and exclusive determination of the plaintiff, and that the performance of such obligation was impossible or would have been highly onerous. In view of the fact that the hearing of the evidence on the construction of the road was postponed for a later occasion, we do not express any opinion on the matter.

This litigation is governed particularly by § § 1206, 1217, 1218, 1254, and 1340 of the Civil Code (1930 ed.).[2]

The question for decision is whether, as respects the controlling elements of the juridical business, there was actually in this case an essential error of fact—*"error in re," "in corpore,"* on the identity of the thing object of the contract, or *"in substantia,"* in its essence or substantial qualities, or, as the latter is better defined by Professor Ruggiero, "error which refers to the essence of the thing or its properties which are considered, in brief, essential to the economic destiny and to the social function of a thing; otherwise stated, an error on the qualities of the object which objectively or subjectively determine its function"—[3] which vitiates the formation of the will and causes the nullity or the nonexistence of the business.[4]

---

[2] *1206—31 L.P.R.A. § 3371:* "A contract exists from the moment one or more persons *consent* to bind himself or themselves, with regard to another or others, to give something or to render some service."

*1217—31 L.P.R.A. § 3404:* "Consent given by *error,* under violence, by intimidation, or deceit shall be void."

*1218—31 L.P.R.A. § 3405:* "In order that the error *may invalidate the consent,* it must refer to the substance of the thing, which may be the object of the contract, or to those conditions of the same, which should have been principally the cause of its execution."

*1254—31 L.P.R.A. § 3513:* "The action for nullity of contracts may be brought by those who are principally or subsidiarily obligated by virtue thereof. Persons with capacity cannot, however, allege the incapacity of those with whom they contracted; neither those who caused the intimidation or violence, or employed deceit, *or caused the error,* can base their action on these defects of the contract."

*1340—31 L.P.R.A. § 3747:* "A promise to sell or buy, there being an agreement as to the thing and price, *gives a right to the contracting parties to mutually demand the fulfilment of the contract."* (Italics ours.)

[3] 1 Roberto de Ruggiero, *Instituciones de Derecho Civil* 268 (annot. 4th ed.).

[4] Under the civil law, which in this connection follows the Roman tradition despite certain modern tendencies—as respects the latter, see I De Gasperi, *Tratado de las Obligaciones en el Derecho Civil Paraguayo y Argentino* 505–12, and the opinion of other textwriters such as De Buen and Alberto Blanco—only the error *of fact* is appreciated. The Code does not mention separately the error which refers to the identity of the thing,

636

The problem before us is one of the will which is difficult to handle. As stated by José Castán with respect to the error in the substance, expressing what is merely the general feeling in the doctrine, "the appreciation of this type of error gives rise to difficult problems because of the diversity of points of view, objective and subjective, from which it may be focused, and because of the confusions arising from the limit line between the subjective error on the qualities or conditions of the thing, which causes the nullity of the contract, and the mere error on the motives, which produces no effect at all"—Castán, *op. cit.* at 359—or other errors, we add, secondary or incidental, which do not vitiate. On more than one occasion the Supreme Court of Spain has so recognized it—"notwithstanding the serious difficulties and lengthy polemics brought about by the concept and the doctrine of the error *'in substantia'* which most..."—Judgment of June 14, 1943—establishing certain basic postulates to which we shall refer hereinafter. For the purposes of such intricate appreciation, it is necessary to make a detailed examination of facts, involved, and, on the face of the record before us, we must agree that the findings of fact made by

---

the error which mistakes one for another *"aliud pro alio,"* but, as in the case of error in the substance, the doctrine and the authorities have classed it as defect of the will. Castán identifies it with the error *"in negotio,"* another error of fact (although some, like Valverde, consider it in law), in that, as in the former, the error in the identity, as he claims, destroys here the declaration of the will and prevents the formation of the juridical act, producing nonexistence, as distinguished from the error in the substance which, under § 1300 of the Spanish Civil Code, produces the condition of voidable. Savigny attributes a like consequence to the error *"in corpore."* Castán himself points out, however, that the Supreme Court of Spain does not establish a marked difference between the error in the identity and the error in the substance of the thing, attributing the same condition of voidability. 3 Castán, *Derecho Civil Español, Común y Foral* 357–60 (8th ed.). In view of the particular litigious question in the case at bar, it makes no difference whether the defect produces the nonexistence of the act or lack of juridical reality as well as if no consent had been given, or, if there is consent with defect, it produces the nullity under § 1252 of the Civil Code, 31 L.P.R.A. § 3511.

the trial court do not comprise undisputed facts which, in the light of the applicable doctrine, provide essential elements of judgment for determining, as it did, whether the contract should be annulled. We therefore feel bound to make an analysis of the evidence.

Engineer Ángel del Valle, witness for the defendant, testified that in June 1952 he was working for Ramos in the WKAQ, and that the latter asked him to take a look at the lands called "La Marquesa" in Aguas Buenas, and to determine whether they were fit for a television tower. He inspected the lands and informed Ramos that he thought that that was an ideal location from which San Juan and many towns could be seen. Ramos asked him what he knew about that hill, to which the witness answered that the hill belonged to a man by the name of Capó, who was a close friend of his brother Manolín. They got in touch with Manolín, and Ramos and Del Valle called on Capó in his office some time before June 22 (date of the first option) for the purpose of finding out if he was willing to sell part of the land of that hill. They spoke of the purpose to purchase part of the hill and that they were interested in the highest point from which San Juan and other towns could be seen; the higher, the better. The witness inquired whether there was land for constructing a building, and Capó said that there was space for a building in addition to the tower, that there was a flat portion, that on the flat portion there were not many trees, and that there was enough land for the buildings. Capó then invited Del Valle to inspect the hill from a closer range, and two or three days later the latter visited him on his farm, where he viewed the hill from the parlor of the house. They talked again on the details already mentioned, the witness asked him with respect to the United States bench mark there, and Capó told him that he had been several times to the

place where the mark is placed and that it was on his land; that up there it looked flat and that many towns could be seen.

On August 9, 1952 (the option had not yet been accepted by August 22), the witness again went to look at the property in the company of Lic. González, attorney for the defendant, for the purpose of climbing the hill. Lic. González remained down in the car and Capó and the witness started to climb the hill. It was raining that day and the slippery land made the ascent difficult at that place. They walked from 18 to 20 minutes, it started to rain, the witness inquired whether he had to walk much, to which Capó answered that they had to make several turns in order to reach a flat portion up there. The witness insisted on seeing the flat portion of the hill, and Capó said to him that it was flat up there, and as it continued to rain they descended. Upon reaching the automobile where González was, they talked in general terms about the purchase of the land and of the road, which Capó said would cost $18,000, and the witness figured from $40,000 to $50,000. About one week later Oviedo asked the witness to take a letter and a check to Capó, dated August 22, which he did. After that he did not see him again. He said that Capó never gave him the plan of the property, nor did he ask him for it. Also, that he had not taken an altimeter nor any instrument of any kind to the hill.

On cross-examination he testified that Ramos had sent him to find out whether San Juan and other towns, which had been seen from another point, could be seen from the hill. Upon being asked whether he had not been to see the hill in order to inform his boss, he said he did not see it; that Capó informed him on the altitude, which was his main interest, and "I looked at the hill and could see that it was high. I did not have to see the hill to conclude that the place was ideal for our purposes, because the city of San Juan

could be seen and the flatter part was at the top. Q.—Do you mean to tell me that it was not necessary for you to go up to the hill in order to conclude that the place was fit for your purposes? A.—For me it was not necessary because it was nothing new, because I had been on the back of the hill and could see it from behind the hill; I had been in the housing project there, which was constructed by Mr. Santaella, and from there I could see the city of San Juan, and I had in mind what could be seen from the hill." The witness further testified that he had been sent by Ramos or his attorney because they wanted to see the exact spot where they were going to build the station, and wanted to make sure that the place would be on the highest point so it would cover more land. He did not reach the exact place where they were going to build the station, in the first place, because he could not climb by the place where they were going; in the second place, because it was raining. As far as he could climb, he reckoned "that the place was good and that it was flat at the top." Q.—Do you mean to tell me that you never went to the exact spot which in your opinion was ideal for the installation of the station? A.—I did not. I did not go. Lic. González, attorney for Ramos, authorized me to buy and he visited the farm. Upon being asked by the court to clarify a point, the witness said that he spoke with González in general terms in connection with the acceptance of the option, and that he was giving him his opinion as to whether or not the place was appropriate since the place had been decided upon; what they were viewing there was what they were going to purchase. Upon being asked whether he was not interested in finding out the altitude of the hill: "We already had in our office the official altitude covered by the hill, but actually I did not look for it, all those details were available since we first thought of the hill... since I was an electrical engineer and the others civil engineers...

Q.—Were you not sent to view the hill? A.—Yes, to find out my opinion. Q.—And you did not even inspect the hill? A.—I did not reach the top." He said that he did not see plaintiff's boundary fence on the hill. Judging by the altitude to which he climbed, he did not know absolutely the altitude which he had reached. Lastly, the witness testified that Capó never objected to defendant or his employees entering the farm.

The defendant himself testified that early in 1952 he started to take steps to obtain a permit for the construction of a television tower. An employee of the Communications Authority told him that the highest and most accessible point around that whole place was on the land of the hill "La Marquesa." He brought him the book of the United States Federal Department showing the triangulations or highest points and pointed to him "La Marquesa Hill." He noticed, from the technical viewpoint, that it was more or less the highest point about 12 or 15 miles from San Juan, since a television station could not be farther from the area. He asked Del Valle to find out who owned the property, and the latter told him that his brother Manolín was a close friend of Capó, the owner thereof. Manuel del Valle and Capó talked about it and Ramos learned that Capó was willing to sell for $500 a cuerda. He left for Europe in the middle of June, entrusting to Lic. González the professional part and to Ángel del Valle the mechanical part. On August 21, 1952, while he was in Europe, he learned that the option was about to expire and asked González to inform him on the terms thereof. In answer to a letter from González, he said, "do your best," and authorized him to exercise the option. He returned to Puerto Rico in September. In April 1953, he met with Capó, the attorneys of both parties, Oviedo and Delgado Márquez, and everything was cordial. On May 1, 1953, engineer Rafael Delgado Márquez started to work for him as

television manager. While he was in the United States, Delgado Márquez called him up and informed him that "we could not obtain that place on Capo's property." He told him that it was located on Ortiz Toro's lands. He asked Delgado Márquez to call up Ortiz Toro "because I realized that in our application to the Federal Communications Commission, Capó's place did not agree with the facts." He said that he did not ask Capó for the co-ordinates of the land object of the option.

On cross-examination, Ramos testified that the F.C.C. had assigned three channels to San Juan: 2, 4, and 6; conversations were held with the government station to use the same tower, which would be possible according to his experience; that the construction of the government road was started in April or May 1953; that there was no road when he accepted the option; he did not contribute money toward the construction of that road, but furnished to the government, in May or June 1953, a study which he had made on the advantages.

The account of these facts, as related by the plaintiff, was as follows: Manuel del Valle called him up to inform him that Ramos was interested in acquiring from him a piece of land to construct a television tower, to which he agreed on the basis of $500 per cuerda and other conditions to be stipulated. The next day Ángel del Valle went to his office to ask for an option in favor of Ramos on five cuerdas. He told him that he had inspected the farm. The witness drew up the option, which his attorney examined, and then sent it to Lic. González with Del Valle himself. The next day after drawing up the option, Del Valle asked him for the blueprints of the land and the co-ordinates of the highest point of his farm, to which he answered that he had never had any and that he could not make them because he was not an engineer. Regarding the plan of the land, he explained that the option had not been accepted and surveyed

as yet, and offered him a plan of the farm which he claimed to have delivered to him. One day after this conversation, Ramos called him up to ask him again for the co-ordinates, because they had to file the application together with the co-ordinates of the highest point. When the witness informed him that he could not furnish them, Ramos told him that they would use those of the bench mark, the point marked there at a place of the hill "La Marquesa." The witness informed him that that point was not within the property, that his property was all fenced in and the point was outside, to which Ramos said that he would send the application together with the co-ordinates of the bench mark, so as to give an idea in the application, and that that could be fixed up later. A meeting was subsequently held at which they talked about the tower, the power lines, the water, and the road. A few days later González asked him for an extension because he had been unable to reach Ramos in Nice, and the new option was signed. By that time the road which at present leads to the tower had not been constructed. The television tower was constructed at a distance of one meter from the fence which divides the witness' lands from those of Ortiz Toro, and a corner of that fence was destroyed by the bulldozer when making the levelling for the structure. In addition to the visit by Del Valle and Lic. González, Casenave and an American gentleman visited the farm before accepting the option for the purpose of taking pictures of the entire place.

On cross-examination he said that, as a matter of fact, the highest point of the hill was not on his farm which is adjacent to Ortiz Toro's on the ridge of the hill, and that his lands at that point were more or less like Ortiz Toro's; that Ángel del Valle was interested in the highest point of his property, had selected the spot and had been informed that it belonged to the witness. Regarding what happened when he and Del Valle climbed the hill, Capó testified that it was not raining; that it was difficult to climb when they reached a

point 50 feet from the top; Del Valle took out the altimeter, turned back and said: "That's enough. This is the altitude." From that place they could see the fence, and he pointed to the top of his property on the top of the hill, which was located on the north side.

Exhibit 2 of the defendant is a document entitled "Engineering Report Re Application of El Mundo Broadcasting Co., San Juan, Puerto Rico. For Television Broadcast Station Channel 2-100 KW-20 DEC-1279 feet. June, 1952." It is the application accompanied by a study containing sufficient technical information for the construction of the television station. It is stated in that document that the place for the proposed transmitter is located on the hill "La Marquesa" about 12 miles south of San Juan, as shown on the attached topographic quadrangle. The geographic coordinates of that place are 18 degrees, 16 minutes, 53 seconds north latitude, and 66 degrees, 6 minutes, 46 seconds west longitude, at an elevation of 1,673 feet from the sea level. The report contains four photographs of the hill taken in 1952, two of which look to the southwest from different points, one to the north, and another to the south. All the photographs show the location of the tower at the place indicated in the co-ordinates. This document was subscribed and sworn to in Washington, D.C., on June 26, 1952.

Engineer Rafael Delgado Márquez, witness for the defendant, testified that at that time he was general manager of WKAQ in charge of the construction of the tower. In May 1953, he went to that place for the purpose of locating the exact point. He said that those points had already been fixed for the television and were described by the co-ordinates of the land filed with the Federal Communications Commission. The witness took with him Exhibit 2 of the defendant, that is, the application and report of the expert, and another

document entitled "Triangulation in Puerto Rico"—Exhibit 3 of the defendant—published by the Department of the Interior of the United States in co-ordination with the Department of Public Works of Puerto Rico, showing the geographic co-ordinates, for the purpose of determining the point, and also copy of a plan of the property—Exhibit 1 of the defendant—which Ramos had submitted with the application. With those documents he was able to locate offhand the point where the tower was going to be erected, which was exactly the triangular point already determined. The co-ordinates fixed in the triangulation were exactly the same as those shown in defendant's application for the television station. In order to locate easily the point, he followed the instructions in the pamphlet of triangulation and discovered that the point was indicated by a mark at some 200 meters from the west of Capó's property, outside of his boundary.[5] On the east of the hill "La Marquesa" there were three points at the same level. Two were reduced after the construction. A survey of the amount of flat land in this place showed that it was quite small. A very limited flat portion of road extends along the center of the hill from west to east. Capó's tract was located on the slope of the road or border. It would not have been technically impossible to construct the tower on Capó's lands, but it would have been very costly, though not practically impossible.

---

[5] It appears from the witness' testimony and from the minutes of inspection that plaintiff's property actually extended as far as the top of the hill. These 200 meters were not located beyond the boundary in ascending direction, but outside the boundary to one side, on a topographic level which was practically the same, although the point marked on the triangulation was slightly one point higher. Actually, and without the explanation appearing from the record, the tower was not constructed on the highest point already marked and determined in the application, but on another slightly lower point although more or less of the same level.

On cross-examination Delgado Márquez testified that it did not take him any time to determine that the point for the tower indicated in the application was not inside Capó's property; just go to the place and that was all. The farm was enclosed within a fence. It was sufficient to climb to the place. The tower was going to be located on the point determined by the Federal Government, the only point there selected for the tower. The 200 meters mentioned did not change the point either in degrees or in minutes, or in seconds; Puerto Rico is located on 66/18; the difference was practically nothing. The station was not erected on the highest point marked by the government. This was approximately 250 meters from Capo's property, and the tower was constructed at more or less two meters from the boundary of the nearest corner. Two of the legs of the tower were 13 feet high and the other two 41 feet. It was proposed to use Ortiz Toro's lands because there was a table land and because it would be too costly to build the legs on Capó's slope. The witness stated that the government built a road as far as the highest point of the hill and ends there, of which a portion had been built when the construction of the station was commenced and enabled Ramos to transport the materials. When the work was started in May, he learned of an agreement between Ramos and government officers to build that road which would lead to "La Marquesa." The road is some 50 or 60 meters from the highest point of Capó's property. The witness stated that he was acquainted with the terms of the option regarding the construction of a road, but he also knew that the government was going to build one.[6]

The minutes of the inspection confirm the testimony of engineer Delgado Márquez regarding the topography of the land where the tower was erected, as well as regarding the

---

[6] The attorneys for the parties also testified, but their testimonies bear mainly on facts informed to them by Del Valle and Capó.

boundary of plaintiff's property with said land. (See illustration of Exhibit 2 of the defendant, p. 24.) *

So far the disclosures of the record.

██ We know that the declaration of the will is the soul and essence of the juridical business, but it must be an intelligent and conscious will, and also free; neither disfigured nor abnormally formed. In so far as the error affects the contents of the will and its formation, such will is not conscious nor intelligent and, hence, as stated by Colin y Capitant,[7] against the primitive juridical conception of the Roman law in which the formula of the contract was the only thing that mattered, there being no room for error, there arose the most equitable theory of the "respect to the will of the contracting party."

██ According to the textwriters, the error which creates relative nullity (voidability of the transaction), according to the prevailing criterion—the nonexistence included in certain cases for some—is an error of essential fact which constitutes, according to the texts, a false or inaccurate

---

\* SIDE VIEW OF THE HILL "LA MARQUESA" TAKEN FROM PHOTOGRAPH OF EXHIBIT 2 OF THE DEFENDANT LOOKING SOUTH.

(a) Site of the tower in the application, point 18 degrees 16 minutes 53 seconds, north latitude; 66 degrees 6 minutes 46 seconds, west longitude. 1673 feet of elevation.

(b) Site more or less where the tower was constructed.

(c) West boundary more or less of plaintiff's property.

[7] 3 *Curso Elemental de Derecho Civil* 636, 637 (3d ed.). See Judgment of the Supreme Court of Spain of March 5, 1960 (Aranzadi).

representation of the reality; to believe as true what is false, or conversely; the false or mistaken knowledge of a thing or of an act, on account of it being incomplete or nonexistent; failure of the correct representation in the formation of the will, the false motion or the mistaken concept; "inconformity or disagreement between our ideas and the nature of the things," in the *Diccionario de Derecho Usual.* Borrell y Soler [8] says more ingeniously that the error of fact "is the lack of equation between one thing and our knowledge of it. It may lie in the perception of the same thing, in our opinion of it and in the reasoning, if the error lies in some of the premises... The error of perception in this case consists in mistaking one thing for another; that of judgment, in attributing conditions which are lacking, or in not knowing those which it has..." [9] See O. Lenel, *El "error in substantia,"* 11 *Revista de Derecho Privado* 97 (translation). The error is termed by the textwriters proper error or vice error, in the contents or formation of the will, as distinguished from the so-called improper error, the disagreement between the declared will and the internal or real will, or, as stated by Ruggiero, *op. cit.* at 263, between the internal desire

---

[8] *Nulidad de los Actos Jurídicos*, p. 219.

[9] Commenting on the defects of consent, says Mucius Scaevola—20 *Código Civil* 618 *et seq.*—that their nature is psychic or psychological as respects the intention and the will of the contracting party; an abnormal state of the will whether it is the result of a false judgment of the party himself or of a foreign element, or of fraudulent action. And considering the error as such, to have a false idea of the thing, or that the latter possesses some quality which is lacking precisely in the former which was the object of the contract, Scaevola further states that such error is purely subjective, a confusion of the human judgment in passing upon the person or thing which it affects and, hence, "the juridical effect of the error; because, the contracting parties being under the obligation to bind themselves conscientiously or with full knowledge of the obligation, the conscience is lacking when one of the parties has a mistaken knowledge of some cardinal element of the contract, wherefore the inevitable conclusion is the nullity of the latter."

648

and its manifestation, which according to the opinion of some, may lead, not to the vice, but to the complete absence of consent.[10]

■ The error of substance does not only affect the matter or elements of which the thing is composed, but also those qualities or attributes which the parties had particularly in mind at the time of contracting. The Supreme Court of Spain has said in its Judgment of June 14, 1943, referred to above, which has been the object of much comment, "That both in the Roman law and in the modern laws, the recognition of the substantial error, which might cause the nullity of the transaction, *has a very marked exceptional sense*, since, fundamentally, the important point necessary for the existence and efficacy of the juridical business is the declaration of a will and that such declaration be actually in conformity with the desire, *and that the motives which prompted the parties to perform the act may not have any influence*, as a general rule, on the validity of such act. (Italics ours.) . . . That the Spanish Code in particular attaches great importance to the subjective element in the appreciation of the error, since in referring in § 1,266 * to the conditions of the thing which . . . clearly points to the fact that the justification of the essential character of the error must be made in relation to the object and qualities especially borne in mind in the concrete case . . . "

■ There are still some fundamental postulates which must be borne in mind in passing upon the question in litigation herein. These are based on the basic principle of public order of *"pacta sunt servanda"*—agreements must be performed and have the force of law between the parties— consecrated in our civil law. Sections 1208, 1210, 1230,

---

[10] 1 Heinrich Lehmann, *Tratado de Derecho Civil* 371 *et seq.;* I-2 Castán, *op. cit.* at 537 *et seq.;* De Gasperi, *op. cit.* at 512-14—opinion of Savigny and others; Betti, *Teoría General del Negocio Jurídico* 311 *et seq.;* II-1 Puig Brutau, *Fundamentos de Derecho Civil* 103 *et seq.*

\* This section and our § 1218 are identical.

1231. On this postulate of social interest, the validity of the contract and of the consent is presumed, not the error which vitiates it. *Cf. Diez* v. *Bascos,* 5 P.R.R. 199; *Mancheño* v. *Le Brun et al.,* 14 P.R.R. 461. And even if it affects an essential thing, in order that the error may annul the business it is necessary that the former be *excusable;* that it be derived from acts of which the obligor is not aware, and that such ignorance could have been prevented by some prudence or diligence not attributable to the affected party; nor is the error excusable when the ignorance of the true state of the things is due to negligence or fault of the one who invokes it. Neither can it be invoked by the responsible party. Section 1254 *supra.* There are some, like Giorgi, who maintain that inexcusability is presumed, or, at least, that it is necessary to prove duly the excusability.

■■■■ We must weigh the facts in the record in the light of the foregoing doctrinal background. In concrete cases, as has been said, the weighing is not always easy upon balancing the objective or subjective elements in the formation of the will. Analyzing in detail the elements of this case, some doubt arises as to whether there was an error in the substance or the identity of the thing itself, properly speaking, or whether it was rather an inexcusable confusion as to the person who owned the place already selected by the defendant for the location of the station. However, the error with regard to the person does not create a defect of consent unless the purpose of the contract is the person or his personal qualities or attributes. Section 1218 of the Civil Code. Following, however, the well-established rule of the Spanish authorities that the existence of error presents a fundamental question of fact, the determination of which rests upon the trial courts on the basis of the evidence (although it has also been said that it also entails a juridical concept: Judgments of January 31, 1950 and December 5, 1953), we shall assume, as did the trial court, that there

was error. Even so, and without disturbing the manner in which the court resolved the conflicts in the evidence and gave credence to the testimony, rather laying to one side the evidence of the plaintiff, the judgment annulling the contract in the light of the applicable rules of law could not be upheld in view of the undisputed facts revealed by the evidence of the defendant himself.

In the first place, the existence of "plateaus" on the top of the hill and of "flat or semiflat" land referred to in the findings of fact of the court, to which it evidently gave much weight, seems to be a rather exaggerated concept. According to the testimony of engineer Delgado Márquez, the only thing which existed there in this connection was a ridge running lengthwise across the top of the hill, which he called "road" or a small flat piece of land. In the minutes of the inspection the court stated that the tower was constructed more or less on a natural plateau with artificial help after the land was levelled; that the only thing which it had found around the tower was lands which descended steeply forming great cliffs; the tableland where the tower was erected was the only flat portion, which was very little, among all the lands which he could see. Even on the portion of the hill used, which belonged to Ortiz Toro, two legs of the tower measured 13 feet and the other two 41 feet, as stated by Delgado Márquez, and it is logical that these were constructed on a very steep slope which was not the slope which corresponded to the plaintiff. It must be concluded that the so-called plateaus or flat lands in the place were not sufficiently wide to cover the area of the tower base, despite the levelling done.

In the second place, the undisputed facts are that at the time the initial steps were taken and the option of June 24, 1952 was given, the defendant already knew the place where the tower was going to be erected with its geographic co-

ordinates and the required altitude, because he had been so informed in the Communications Authority and shown the official triangulation book, and that it had also been set forth in the application and technical report submitted to the Federal Commission. (Exhibit 2 of the defendant.) It was the defendant and not the plaintiff who possessed the specific information and had the needed knowledge of the location and construction of the tower. At no time did Ramos inform Capó that he needed the place that had the exact geographic location shown by the co-ordinates at an altitude of 1673 feet.[11] On the contrary, he denied having asked Capó for the geographical co-ordinates of the property, and Del Valle denied that he asked him for the plans thereof.

The defendant knew from the beginning the point which he needed, and he could have verified it before accepting the option and binding himself by using the technical data in his possession, which Delgado Márquez verified later on the basis of that information. He could have verified at that time, as did Delgado Márquez, that the place in question was not within Capó's property, which was properly fenced. On the other hand, it was established by Exhibit 2 and the testimony of Delgado Márquez, which was reaffirmed as to this point in the minutes of the inspection, that plaintiff's property extended as far as the top of the hill and covered part of the northern slope of the hill. As established by Exhibit 2, the requirement of altitude for technical reasons of radio broadcasting was the essential quality or condition involved, and the fact is that the tower was built at scarcely two meters from the plaintiff's fence. The point selected in the application which was marked by the Federal Government was not used, but a point 250 meters distant and of a lower level. It is obvious that defendant's problem was not

---

[11] Guillermo Borda designates this as an error *"in mente retenta"* which is inexcusable. 2 *Tratado de Derecho Civil Argentino—Vicios de los Actos Jurídicos* 260 *et seq.*

so much that the plaintiff's property did not contain that specific point, but the cost of construction which would have been substantially higher had the latter's lands been used.[12]

■ These undisputed facts, which evidently the trial court did not take into consideration, lead us to dissent from its criterion and convince us that the error, if any, did not refer to the facts unknown to the defendant or which he could have found out by exercising some care; it was due to his negligence or fault and was not an excusable error. See *Miró* v. *Industrial Commission*, 57 P.R.R. 27, 33, where we said that the manager of the Fund could not bring an action for nullity inasmuch as he was the person responsible for the error of fact. The Supreme Court of Spain said in the said Judgment of June 14, 1943 that, "Even though our Civil Code does not expressly prescribe the requirement that the error be excusable, it must be understood, on the basis of abundant scientific doctrine, that an error which could have been avoided by exercising due diligence can not be invoked by the responsible party for the purpose of annulling the declaration, or, at least, that as stated by this Court in its Judgment of January 15, 1910, the error is much less admissible 'whenever those who contract *are experts or connoisseurs of the respective business...*'" (italics ours), a criterion which is ratified in the Judgment of December 16, 1953, where it was said that "whereas this Court has held in the Judgment of June 14, 1943, among others, that the inexcusable error does not vitiate the consent, which characterized the error invoked by the defendant, and in the judgment appealed from, because it was within the responsible party's province to vanish it by a timely examination of the

---

[12] During this litigation the plaintiff has insisted that the reason for nonperformance was the construction of the road by the government, a fact of which the defendant was aware before the station was constructed. Although the record is not completely devoid of evidence from which to infer such fact, there is no convincing proof for a decision on such allegation.

contract document or duly counseling himself..." See, also, the Judgment of May 23, 1935: "That when the inconformity is attributable to the declarant, because it is malicious or could have been prevented by exercising greater diligence, there being at the same time good faith in the other party, full effectiveness is to be given to the declaration by virtue of the principles of responsibility and of protection to the bona fides and to the security of the juridical business, which object to the possibility ... and to the possibility that the inefficacy of the transaction may be alleged by the very party responsible thereof."

For the foregoing reasons, the judgment rendered in this case by the Bayamón Part of the Superior Court will be reversed and another judgment rendered decreeing the validity and performance of the contract, dismissing the counterclaim, and, as respects that portion of the obligation relative to the construction of certain works, the case is remanded to the trial court to hear the evidence, if either party so desires, and to decide accordingly; and if the specific performance is not in order, to determine the *"id quod interest"* or recovery which may be proper under the applicable law.